UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

JOE JOHNSON,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

Civil Action No. TDC-22-1647

## MEMORANDUM OPINION

Plaintiff Joe Johnson has filed a Fourth Amended Complaint against Defendant United States of America ("the Government") alleging violations of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2674 (2018), and a violation of the Eighth Amendment to the United States Constitution arising from the alleged failure to manage properly the impact of the COVID-19 pandemic at a federal prison at which Johnson was incarcerated. The Government has filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED, and this case will be DISMISSED.

## BACKGROUND

From August 10, 2020 to November 24, 2021, Johnson was incarcerated at the Federal Correctional Institution Schuylkill ("FCI-Schuylkill") in Minersville, Pennsylvania following convictions in the United States District Court for the Eastern District of Pennsylvania for aggravated identity theft and false statements. Specifically, Johnson was designated to a satellite

camp at that prison ("SCP-Schuylkill"). Throughout this period, Ryan Miller was an administrator at SCP-Schuylkill with "primary responsibility over the operation as well as individuals confined at that facility." Fourth Am. Compl. ("FAC") at 1, ECF No. 28.

Johnson's period of incarceration coincided with the COVID-19 pandemic. Johnson contends that during the pandemic, Miller exposed him to dangerous living conditions by failing to adhere to applicable guidance in managing SCP-Schuylkill, including guidance issued by the Centers for Disease Control and Prevention ("CDC"), the Bureau of Prisons ("BOP") COVID-19 Pandemic Response Plan ("the BOP Response Plan"), and internal federal government memoranda relating to the COVID-19 pandemic ("the Internal COVID-19 Memoranda"). Among other failures, Johnson alleges that SCP-Schuylkill continued to bus inmates who had COVID-19 symptoms from the Metropolitan Corrections Center ("MCC") in New York City to SCP-Schuylkill; failed to provide personal protective equipment ("PPE") to correctional officers and staff or require them to wear face masks; allowed correctional officers and staff to continue to work after being exposed to or testing positive for COVID-19 and destroyed documents reflecting such work; and allowed overcrowding within the camp. Johnson further alleges that because of these acts and omissions, there was a COVID-19 outbreak at FCI-Schuylkill beginning on or about December 23, 2020, and that Johnson was sent to FCI-Schuylkill from SCP-Schuylkill for disciplinary reasons despite the outbreak. According to Johnson, he was at high risk for severe illness from COVID-19 because he had hypertension, was prediabetic, and was obese. Johnson also alleges that Miller's March 2021 decision to consolidate living quarters at SCP-Schuylkill increased the risk of viral transmission.

On June 25, 2021, Johnson filed an administrative claim with the BOP in which he alleged that Miller's failure to mitigate and contain COVID-19 exposed Johnson to dangerous living

conditions. Then, on November 23, 2021, Johnson's convictions and sentences were reversed, resulting in his release from SCP-Schuylkill the next day. Johnson asserts that although he was fully vaccinated, he was neither tested nor screened for COVID-19 upon his departure from SCP-Schuylkill, and that he subsequently tested positive for the coronavirus. On February 11, 2022, several months after Johnson's release from SCP-Schuylkill, the BOP denied Johnson's administrative claim.

On July 5, 2022, Johnson filed the original Complaint in this case in the United States District Court for the District of Maryland, in which he asserted claims against the United States relating to the conditions at SCP-Schuylkill, as well as claims of malicious prosecution, false arrest, and related claims against the prosecutor and an investigator who participated in the criminal case resulting in his conviction in the Eastern District of Pennsylvania. On July 20, 2022, the case was transferred to the Eastern District of Pennsylvania. Upon transfer, Johnson voluntarily dismissed his claims against the prosecutor and investigator. The Eastern District of Pennsylvania then dismissed Johnson's case based on improper venue but granted Johnson leave to decide whether to re-file his complaint in either the District of Maryland or the Middle District of Pennsylvania, in which FCI-Schuylkill is located.

On January 16, 2023, Johnson filed a Second Amended Complaint in the District of Maryland that included only the United States as a defendant and asserted tort claims pursuant to the FTCA. On May 31, 2023, Johnson filed a Third Amended Complaint with additional factual allegations regarding Miller. On June 8, 2023, Johnson filed the presently operative Fourth Amended Complaint in which he asserts the following claims in the following numbered counts: (1) negligence; (2) negligence *per se*; (3) negligent infliction of emotional distress; (4) intentional infliction of emotional distress; and (5) a violation of the Eighth Amendment.

## DISCUSSION

In its Motion to Dismiss, the Government argues that: (1) the discretionary function exception to liability under the FTCA bars the common law tort claims in Counts 1 through 4 of the Fourth Amended Complaint; (2) Johnson has not exhausted administrative remedies relating to any tort claims arising after June 14, 2021 and any claim that he contracted COVID-19 at FCI-Schuylkill; (3) Johnson has not suffered sufficient physical injury to recover under the FTCA; and (4) sovereign immunity bars the Eighth Amendment claim in Count 5.

### I. Legal Standard

The Government moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. It is the plaintiff's burden to show that subject matter jurisdiction exists. *Evans v. B.F. Perkins Co., Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). Rule 12(b)(1) allows a defendant to move for dismissal upon a belief that the plaintiff has failed to make that showing. When a defendant asserts that the plaintiff has failed to allege facts sufficient to establish subject matter jurisdiction, the allegations in the complaint are assumed to be true under the same standard as in a Rule 12(b)(6) motion, and "the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). When a defendant asserts that facts outside of the complaint deprive the court of jurisdiction, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *Kerns*, 585 F.3d at 192. The court should grant a Rule 12(b)(1) motion based on a factual challenge to subject matter jurisdiction "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."

4

*Evans*, 166 F.3d at 647 (quoting *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).

## II.     FTCA Claims

The Government first seeks dismissal of the tort claims in Counts 1-4 based on the discretionary function exception to the FTCA. Generally, the United States government is immune from suit unless it has expressly waived sovereign immunity. *Fed. Deposit Ins. Co. v. Meyer*, 510 U.S. 471, 475 (1994). The FTCA provides a limited waiver of sovereign immunity to permit a suit for damages against the United States for "personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §§ 1346(b), 2674. This waiver of sovereign immunity is subject to certain exceptions. *See id.* § 2680. As relevant here, the FTCA's waiver does not apply to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.* § 2680(a).

This discretionary function exception, like other exceptions to the FTCA's immunity waiver, "work to defeat the subject matter jurisdiction of the federal courts." *Blanco Ayala v. United States*, 982 F.3d 209, 214 (4th Cir. 2020). "Thus, the burden is on the plaintiff in . . . a[n] [FTCA] suit to establish 'that the discretionary function exception does not foreclose their claim.'" *Id.* (quoting *Seaside Farm, Inc. v. United States*, 842 F.3d 853, 857 (4th Cir. 2016)). To determine whether the discretionary function exception applies, courts engage in a two-step analysis. *Bulger v. Hurwitz*, 62 F.4th 127, 142 (4th Cir. 2023). First, the court considers whether the acts in question

"are discretionary in nature" in that they involve "an element of judgment or choice." *Blanco Ayala*, 982 F.3d at 214 (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). Conduct generally involves an element of judgment or choice "unless a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Bulger*, 62 F.4th at 142 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). Second, a court "must determine whether the challenged governmental actions and decisions were based on considerations of public policy." *Id.* (quoting *Berkovitz*, 486 U.S. at 537). "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* at 143 (quoting *Gaubert*, 499 U.S. at 324). So long as the general nature of the challenged decision is one expected to be "inherently grounded in considerations of policy," the exception bars recovery. *See Blanco Ayala*, 982 F.3d at 215 (quoting *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993)).

The United States Court of Appeals for the Fourth Circuit has applied the discretionary function exception to FTCA claims based on the assertion that BOP officials in a federal prison failed adequately to protect an inmate from physical harm. *Bulger*, 62 F.4th at 145. In *Bulger*, the court upheld the dismissal of an FTCA claim based on the failure of prison officials to prevent inmates from killing James "Whitey" Bulger, an organized crime leader from Boston, Massachusetts, when he was incarcerated at the United States Penitentiary Hazelton in West Virginia, because the federal statutes requiring the BOP to provide for the "safekeeping" and "care" of federal prisoners allowed BOP officials to "exercise broad discretion in safeguarding and protecting inmates." *Id.* at 133, 143. Likewise, in *Rich v. United States*, 811 F.3d 140 (4th Cir. 2015), the court dismissed, pursuant to the discretionary function exception, an FTCA claim based

6

on the failure to protect an inmate after he was placed in a recreation cage with other inmates who then brutally attacked him. *Id.* at 145-46. The court held that under the applicable statutes and regulations, "[p]rison officials are afforded discretion in determining where to place inmates" and whether to keep them "separated from one another." *Id.* at 146.

Although the actions of BOP officials in caring for and safeguarding federal prisoners are generally discretionary functions, Johnson argues that Miller and other officials at FCI-Schuylkill lacked discretion in how to address the COVID-19 pandemic because they were bound to follow certain written guidance applicable to the BOP, specifically the CDC guidance, the BOP Response Plan, and the Internal COVID-19 Memoranda.

The CDC guidance referenced by Johnson, entitled "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," ("the CDC Guidance"), states at the outset that it "is intended to provide guiding principles for . . . administrators of correctional and detention facilities" and that it "will not necessarily address every possible custodial setting." National Center for Immunization and Respiratory Diseases (U.S.), Division of Viral Diseases, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* at 2, Centers for Disease Control and Prevention (Dec. 31, 2020), https://stacks.cdc.gov/view/cdc/100951 ("CDC Guidance"); *see* FAC at 3, ECF No. 28 (citing this Guidance). The CDC Guidance emphasizes that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." CDC Guidance at 2. Furthermore, the CDC Guidance explicitly describes its provisions as "guidance" and "[r]ecommendations" that should be applied "based on the progress of the outbreak in a particular facility and the surrounding community." *Id.* at 6.

Thus, the CDC Guidance does not impose mandatory requirements on BOP officials, including those operating FCI-Schuylkill and SCP-Schuylkill.

As to the specific issues identified by Johnson, such as the failure to provide correctional staff with PPE or to require staff to wear face masks, the CDC Guidance frames its identified prevention practices as measures that "should" be undertaken, and in some instances only "[w]hen feasible and consistent with security priorities." *Id.* at 15. As to face masks, the CDC Guidance recommends that correctional staff be "encourage[d] . . . to wear a cloth face mask as much as safely possible . . . ." *Id.* at 12. Although Johnson focuses on the alleged busing of inmates with COVID-19 symptoms from MCC to SCP-Schuylkill, the CDC Guidance states that "transfers of incarcerated/detained persons to and from other jurisdictions and facilities" should be suspended "unless necessary for medical evaluation, medical isolation/quarantine, health care, extenuating security concerns, release, or to prevent overcrowding," thereby requiring the exercise of judgment and discretion in determining whether transfers are necessary and appropriate. *Id.* at 18.

As for the BOP Response Plan, first issued on August 31, 2020 and later modified, it states that it was "designed to provide specific guidance on responding to" COVID-19 and that the medical management of COVID-19 at federal prison facilities consists of "clinical decisions" subject to deference to the Regional Medical Director "within the clinical context of each situation and scenario." BOP Response Plan at 11,[1] Opp'n Ex. 1, ECF No. 37-2. Rather than impose specific requirements on the use of PPE, the BOP Response Plan provides only "[r]ecommended levels of PPE" and states that recommended forms of PPE for both incarcerated individuals and staff "will vary" based on factors such as "the type of contact with inmates" and "the type of

---

[1] All references to the BOP Response Plan use the pagination generated by the Court's Case Management / Electronic Case Files ("CM/ECF") system.

procedure being performed." *Id.* at 26-27. In discussing steps to be taken when staff has potential exposure to COVID-19, the BOP Response Plan provides only "[g]uidance" without imposing mandatory requirements. *Id.* at 109. Thus, the BOP Response Plan, like the CDC Guidance, does not impose mandatory requirements for addressing COVID-19 at BOP prisons.

The Internal COVID-19 Memoranda referenced by Johnson consist of 48 memoranda issued by various United States Department of Justice ("DOJ") and BOP officials, including: the Attorney General of the United States; the Deputy Attorney General; the Assistant Attorney General for Administration; the Director of the BOP; the National Health Systems Administrator of the BOP Health Services Division; the Medical Director of the BOP Health Services Division, and the Assistant Director of the BOP Health Services Division. The memoranda were issued during the early stages of the COVID-19 pandemic, from January 2020 to May 2020. Johnson argues that the Internal COVID-19 Memoranda "made the [BOP] Response Plan at all BOP facilities . . . mandatory." Opp'n at 8, ECF No. 37-1.

Upon review of the Internal COVID-19 Memoranda, the Court finds that many do not relate to the BOP Response Plan or the issues raised by Johnson in the Fourth Amended Complaint. Those that address those topics, in many instances, provide similar levels of discretion to prison officials as provided by the CDC Guidance and the BOP Response Plan. For example, an April 6, 2020 memorandum entitled "Coronavirus (COVID-19) Update – Use of Face Masks," stated that "staff should be issued two face masks" and that "[s]taff and inmates should be advised that masks are to be used in interacting with persons when social distancing is not possible." Internal COVID-19 Memoranda at 80, Opp'n Ex. 3, ECF No. 37-4. More importantly, although several of the Internal COVID-19 Memoranda address one or more of the COVID-19 response issues identified by Johnson, none explicitly or implicitly state that the BOP Response Plan was generally

mandatory, or that its provisions should be read to be mandatory. Indeed, the first version of the BOP Response Plan was not even issued until August 2020, three months after the last of the Internal COVID-19 Memoranda was issued.

The Internal COVID-19 Memoranda include several memoranda that appear to be precursors to the BOP Response Plan and impose certain mandates or requirements, including a March 13, 2020 memorandum entitled "Coronavirus (COVID-19) Phase Two Action Plan" that suspended social visits, legal visits, and internal movements of prisoners for 30 days; and a March 26, 2020 "Coronavirus (COVID-19) Phase Four Action Plan," which mandated screening of inmates newly admitted to the BOP and of staff and visitors to BOP prisons. However, the topics addressed by the mandatory provisions in these earlier memoranda are addressed in the BOP Response Plan in a non-mandatory manner. Moreover, several documents containing certain mandatory provisions, including the Phase Five, Phase Six, and Phase Seven Action Plans, facially remained in effect only until June 30, 2020, over a month before the BOP Response Plan was first established and over a month before Johnson was first incarcerated in a BOP facility. Thus, the Court does not find grounds to conclude that the terms of these memoranda, or any other Internal COVID-19 Memoranda, rendered the terms of the BOP Response Plan mandatory at the time of Johnson's incarceration.

The Court therefore finds that the CDC Guidance and the BOP Response Plan did not impose mandatory requirements relating to the acts and omissions underlying Johnson's FTCA claims during the period of his incarceration. Rather, they provided only guidance that permitted BOP officials, including those at FCI-Schuylkill and SCP-Schuylkill, to exercise discretion and judgment in deciding how specifically to address the COVID-19 pandemic. Notably, multiple federal district courts have likewise concluded that the CDC Guidance and the BOP Response Plan

were discretionary in nature and thus dismissed FTCA claims by federal prisoners alleging an inadequate response to the COVID-19 pandemic based on the discretionary function exception. *See, e.g., Brown v. United States*, No. 22-0124-GMG, 2023 WL 4744597, at *1, *7 (N.D. W. Va. July 25, 2023) ("The BOP's own description of its document makes clear that the protocols are not mandatory, and the BOP even acknowledges that it may be impossible to establish or enforce mandatory uniform policies."); *Santiago v. United States*, No. 21-0436-JPJ, 2022 WL 790805, at *2-3 (W.D. Va. Mar. 14, 2022) ("I find that the BOP's handling of COVID-19 and the protective measures it put into place involved an element of judgment or choice. . . . CDC guidance was just that—guidance."); *Sanford v. United States*, 21-2552-RMG, 2022 WL 17369375, at *1, *3 (D.S.C. Dec. 2, 2022) ("The Magistrate Judge correctly noted that the evidence regarding the BOP's COVID-19 policies does not suggest there was a mandatory course of action to be followed.").

More specifically, the Court further finds that, whether subject to the general statutes governing the operation of federal prisons or to the specific CDC Guidance and BOP Response Plan relating to the COVID-19 pandemic, the specific acts and omissions identified by Johnson as bases for FTCA liability are discretionary in nature and are thus presumptively grounded in public policy considerations. *See Blanco Ayala*, 982 F.3d at 214. For example, decisions on whether to bus inmates from the MCC to SCP-Schuylkill during the pandemic, what levels of occupancy to have in particular units within SCP-Schuylkill during the pandemic, whether and when to designate Johnson to either SCI-Schuylkill or FCI-Schuylkill during a COVID-19 outbreak, and whether to consolidate two separate living quarters within SCP-Schuylkill during the pandemic are discretionary decisions not mandated by statute, the CDC guidance, BOP Response Plan, or the Internal COVID-19 Memoranda. As access to PPE was understood by relevant guidance to vary based on needs and capacity, decisions at SCP-Schuylkill regarding whether to provide

certain PPE to correctional staff, as well as decisions on whether staff would be called upon to work in the same time frame that they had COVID-19 symptoms, were similarly discretionary, requiring some judgment or choice, and therefore not subject to liability under the FTCA. Because the alleged tortious conduct consists of actions subject to the discretionary function exception, the Court will grant the Motion to Dismiss as to the FTCA claims in Counts 1-4.

Given that the Court will grant the Motion as to Counts 1-4 based on the discretionary function exception, it need not and will not address the alternative arguments for dismissal of those counts.

### III.     Eighth Amendment Claim

The Government seeks dismissal of Count 5, a claim against the United States for a violation of the Eighth Amendment right to be free from cruel and unusual punishment, as barred by sovereign immunity. The United States Supreme Court has held that the FTCA's waiver of sovereign immunity does not extend to constitutional tort claims. *See, e.g.*, *Meyer*, 510 U.S. at 478 ("[T]he United States simply has not rendered itself liable under [the FTCA] for constitutional tort claims."); *see also Reinbold v. Evers*, 187 F.3d 348, 355 n.7 (4th Cir. 1999) ("Because the United States has not waived sovereign immunity in suits claiming constitutional torts, [Plaintiff's] Fourth Amendment claim against the United States necessarily fails."). Therefore, Count 5 will be dismissed for lack of subject matter jurisdiction.

Johnson requests that in the event of such a dismissal, the Court should grant him leave to file a Fifth Amended Complaint to add Miller as the defendant for the Eighth Amendment claim in Count 5. Generally, a court should "freely give leave" to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). Courts deny leave to amend "when the amendment would be

prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986).

Here, the Court finds that the proposed amendment would be futile. An Eighth Amendment claim asserted against a federal official such as Miller would constitute a claim pursuant to *Bivens v. Six Unknown Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), in which the Supreme Court held that the plaintiff had an implied cause of action for damages based on an alleged violation of the Fourth Amendment arising from an arrest allegedly conducted without probable cause and with the use of unreasonable force. *Id.* at 389, 397. In *Davis v. Passman*, 442 U.S. 228 (1979), the Supreme Court extended *Bivens* and held that a former congressional staff member who asserted a sex discrimination claim under the Fifth Amendment had an implied cause of action for damages. *Id.* at 231, 248-49. In *Carlson v. Green*, 446 U.S. 14 (1980), the Supreme Court further extended *Bivens* and held that the estate of a federal prisoner who died in custody had an implied cause of action for damages under the Eighth Amendment based on alleged deliberate indifference to serious medical needs. *Id.* at 16 & n.1, 18-19, 25.

In 2022, however, the Supreme Court held in *Egbert v. Boule*, 142 S. Ct. 1793 (2022), that a two-step inquiry governs whether a *Bivens* claim may proceed. *Id.* at 1803. First, a court asks whether the case presents "a new *Bivens* context" in that it is "meaningful[ly]" different from the three cases in which the Court has implied a damages action. *Id.* at 1803 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 139 (2017)). Among the potential differences to be considered are the constitutional right at issue, the rank of the officers involved, the statutory or other legal mandate under which the officer was operating, and "the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Ziglar v. Abbasi*, 582 U.S. 120, 139-40 (2017). Second, "if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the

Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 142 S. Ct. at 1803 (quoting *Ziglar*, 582 U.S. at 136).

Following *Egbert*, in *Tate v. Harmon*, 54 F.4th 839 (4th Cir. 2022), the Fourth Circuit concluded that a prisoner's Eighth Amendment conditions-of-confinement claim involved a new *Bivens* context different from that of the Eighth Amendment inadequate medical care claim in *Carlson* and thus declined to permit such a *Bivens* claim to proceed. *Id.* at 845-46. Here, where Johnson has not alleged that he actually had COVID-19 while in federal prison, or any other serious medical need that went untreated, his Eighth Amendment claim can be construed only as a claim of unconstitutional conditions of confinement based on the conditions that resulted from the COVID-19 pandemic. The Fourth Circuit, however, in declining to extend *Bivens* to claims of unconstitutional conditions of confinement, concluded that where the plaintiff has "alleged neither serious physical injury nor any particularized damage from the conditions he challenges . . . 'Congress is in a better position to decide whether or not the public interest would be served by imposing a damages action' against such officials." *Id.* at 846 (quoting *Egbert*, 142 S. Ct. at 1807). Where Johnson has likewise alleged neither serious physical injury nor particularized damage from his conditions of confinement, the Court concludes that an amendment to add a *Bivens* claim against Miller for unconstitutional conditions of confinement would be futile. The Court therefore denies leave to amend the complaint.

## CONCLUSION

For the foregoing reasons, the Government's Motion to Dismiss for Lack of Subject Matter Jurisdiction, ECF No. 31, will be GRANTED. A separate Order shall issue.

Date:   November 14, 2023

THEODORE D. CHUANG
United States District Judge